UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X
MARIA LOPEZ,

                           Plaintiff,

      -against-                           **COMPLAINT**

GARY BARNETT and AYALA BARNETT,

                         Defendants.
------------------------------------------------------------------------ X

Plaintiff Maria Lopez ("Lopez" or "Plaintiff"), by her attorneys Pechman Law Group PLLC, complaining of defendants Gary Barnett and Ayala Barnett (collectively, the "Barnetts" or "Defendants"), alleges:

## NATURE OF THE ACTION

1. Maria Lopez was employed as a housekeeper for Gary and Ayala Barnett for over nine years. Throughout her employment, Defendants required Lopez to work, on average, between 65 and 86 hours per week, yet paid her on a weekly salary basis that failed to compensate her at 1.5 times her regular hourly rate for hours worked over 40 each week.

2. Lopez brings this action pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), the New York Labor Law § 190 *et seq.* ("NYLL"), the Domestic Workers' Bill of Rights ("DWBR"), and the New York State Wage Theft Prevention Act ("WTPA") seeking declaratory relief against Defendants' unlawful actions and to recover unpaid overtime wages, liquidated and statutory damages, pre- and post-judgment interest, and attorneys' fees and costs.

## JURISDICTION

3. This Court has subject matter jurisdiction of this case pursuant to 29 U.S.C. § 216(b), 28 U.S.C. §§ 1331 and 1337, and has supplemental jurisdiction over Plaintiff's claims under the NYLL pursuant to 28 U.S.C. § 1367.

## VENUE

4. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because many of the events and omissions alleged in this Complaint occurred in this district and Defendants reside in this district.

## THE PARTIES

**Plaintiff Maria Lopez**

5. Plaintiff Maria Lopez resides in Rockland County, New York.

6. Lopez worked as a live-in domestic worker for Defendants in their private homes in Queens, New York and Monsey, New York in Rockland County from approximately September 2010 to December 2017.

7. From approximately January 2018 through March 18, 2020, Lopez worked as a non-live-in domestic worker for Defendants in their home in Monsey, New York.

8. From approximately July 12 to August 31 of every year of her employment with Defendants, Lopez worked as a live-in domestic worker for Defendants in their home in Scott, Pennsylvania.

**Defendants Gary Barnett and Ayala Barnett**

9. The Barnetts are husband and wife. They have ten children between them, including children from previous marriages. The youngest six children, who lived at home when Lopez started working for the Barnetts, are currently 12 years old, 15 years old, 17 years old, 27 years old, and two are 29 years old. Since 2016, only the Barnetts' three youngest children lived at home.

10. Defendant Gary Barnett is a resident of Rockland County and owns homes in Queens, New York, Monsey, New York, and Scott, Pennsylvania.

11. Mr. Barnett is the founder and chairman of Extell Development Company, a real estate development firm that has developed several super luxury buildings in New York City, including One57 and Central Park Tower, the world's tallest and most expensive residential building in the world. Mr. Barnett was referred to by the Wall Street Journal as "The Man Behind Billionaires' Row" in Manhattan. *See* Katherine Clarke and Candace Taylor, *The Man Behind Billionaire's Row Battles to Sell the World's Tallest Condo*, The WALL STREET JOURNAL (Jan. 17, 2019), *available at* https://www.wsj.com/articles/the-man-behind-billionaires-row-battles-to-sell-the-worlds-tallest-condo-11547739897 (last visited Sept. 1, 2020).

12. Throughout Lopez's employment, Mr. Barnett would regularly assign and direct Lopez's work duties.

13. Throughout Lopez's employment, Mr. Barnett determined Lopez's rate of pay and handed Lopez her pay each Friday.

14. Defendant Ayala Barnett is a resident of Rockland County and, together with her husband Mr. Barnett, owns homes in Queens, New York, Monsey, New York, and Scott, Pennsylvania.

15. Throughout Lopez's employment, Ms. Barnett would regularly assign and direct Lopez's work duties.

16. Defendants exercised sufficient control over Lopez's employment to be considered Lopez's employer under the FLSA and NYLL.

## FACTS

**Queens Residence**

17. From the beginning of Lopez's employment in 2010 until approximately January of 2017, Lopez worked as a live-in housekeeper at the Barnett's residence in Queens, New York the ("Queens residence"), an 8,000 square foot home with nine bedrooms and eleven bathrooms.

18. Lopez's duties at the Queens residence included cleaning all nine bedrooms, eleven bathrooms, the kitchen, living room, and any other room in the house. She also washed, ironed, and folded the laundry for the Barnett family, cleaned up after the children still living at home, ran errands, cooked for the family and their guests, served dinner to the family, cleared the table and washed dishes, and cared for the children.

19. When the Barnetts moved to Monsey, New York in January 2017, they continued to use the Queens residence for holidays like Rosh Hashanah and Passover.

20. During the holidays, the Barnetts would host dinners for up to thirty friends and family. In anticipation of these dinner parties, Lopez spent all day preparing vegetables and cooking. After these holiday dinners, Lopez cleaned up after all the guests and washed all the dishes.

21. Lopez had her own room and bathroom at the Queens residence.

**Rented Monsey Residence**

22. From approximately January 2017 until December 2017, Lopez worked as a live-in housekeeper at the Barnett's rented home in Monsey, New York ("Rented Monsey residence"). The house has six bedrooms and four and a half bathrooms.

23. From approximately January 2018 until March 2020, Lopez worked as a housekeeper at the Rented Monsey residence.

24. At the Rented Monsey residence, Lopez continued to perform her duties of cleaning the home, taking care of the children, and all other tasks as directed by the Barnetts.

25. At the Rented Monsey residence, Lopez had her own room and bathroom, where she slept two days per week.

**Constructed Monsey Residence**

26. In or about June 2020, the Barnetts moved into their newly constructed house located in Monsey, New York.

27. The Barnetts built this home during the last two years of Lopez's employment.

28. Lopez was only sent to work at this residence in the last week of her employment with the Barnetts in March 2020.

**Pennsylvania Residence**

29. Every summer during Lopez's employment, the Barnetts spent a month and a half at their home in Scott, Pennsylvania (the "Pennsylvania residence"). The Pennsylvania residence has eight bedrooms and five bathrooms.

30. The Barnetts and Lopez traveled to the Pennsylvania residence on or about July 12 each year, and stayed there until the family returned to their house in either Queens or Monsey at the end of August so the children could attend school.

31. While in Pennsylvania, in addition to her regular duties cooking, cleaning the house, and taking care of the children, Lopez was also required to wash and scrub the outside patio.

32. In August each year, Mr. Barnett's two adult daughters would stay at the Pennsylvania residence with their families for the month. As many as sixteen people were living at the home during this period.

33. Furthermore, the Barnetts regularly invited friends and other family members to stay with them at the Pennsylvania residence. Up to twenty people would stay in the Pennsylvania home with the Barnetts and Lopez on any given weekend.

34. The Barnetts routinely hosted lunch and dinner parties at the Pennsylvania residence for their overnight guests, for which Lopez prepared, cooked, and served dinner and, afterwards, cleared and cleaned the dining room and kitchen.

35. Lopez had her own room at the Pennsylvania residence, but she was required to sleep in a neighbor's house when the house was full of guests.

**Lopez's Work Duties**

36. Each workday, Ms. Barnett directed Lopez's work duties, telling her what was needed in addition to Lopez's regular work tasks.

37. When not at home, Ms. Barnet regularly communicated with Lopez via text message and/or would frequently call Lopez to update or modify assigned tasks.

38. Lopez would typically begin her workday by tending to the Barnetts' kitchen by cleaning it and beginning cooking duties Ms. Barnett had assigned.

39. Upon finishing kitchen duties, Lopez would begin other housekeeping tasks, such as washing, ironing, and folding laundry and cleaning all bedrooms and bathrooms in the house.

40. Lopez was responsible for preparing and cooking dinner with Ms. Barnett for the family each workday, and approximately twice per week Lopez prepared lunch for the children to take to school or summer camp.

41. Two or three Fridays per month, the Barnetts held Shabbat dinners for up to fifteen people, including friends and family. The Shabbat dinners took place at either the home of one of the Barnetts' daughters in Monsey, New York or at the Barnetts' residences in either Queens or Monsey.

42. On Fridays, Lopez's primary responsibility was to prepare dishes and ingredients for Shabbat dinner, regardless of whether the dinner took place at the Barnetts' or their daughter's house. In anticipation of Shabbat dinner, Lopez cooked dishes like string beans, sweet potatoes, and vegetable soups; she cleaned and cut vegetables for traditional Jewish dishes, such as cholent and kugel, which would be put together and cooked by Ms. Barnett; and she prepared components for desserts, such as making and shaping cookies and cutting apples for apple pie, which would then be put together and baked by Ms. Barnett . As a result, Lopez's cooking duties took up most of her workday each Friday.

43. On Friday, Lopez was also responsible for cleaning up after the Shabbat dinner ended and guests departed.

44. In addition to performing her cleaning and cooking duties, Lopez also assisted in the care of the Barnetts' children still living at home by, for example, watching over them, feeding them, cleaning up after them, and entertaining them when necessary throughout the day. Specifically, Lopez performed these tasks for the Barnetts' three youngest children, who were 17 months old, 3 years old, and 5 years old when she began working for the Barnetts.

45. The Barnetts regularly went out for dinner on Thursday evenings, leaving Lopez to feed the children, occasionally bathe them, entertain them, and put them to bed around 8:00 p.m.

46. From approximately September 2016 until September 2017, the Barnetts regularly sent Lopez to their daughter's house in Monsey on Fridays, when Shabbat dinner took place there, and Sundays. If working there on a Friday, Lopez would arrive to the Barnetts' daughter's house late Thursday evening and sleep there. She would then spend almost all of Friday preparing for the Shabbat dinner. If working there on a

7

Sunday, Lopez would arrive at approximately 10:00 a.m. and stay there for approximately 5 hours to clean and cook for the Barnetts' daughter's family, including her three children who were five, seven, and ten years old.

47. From approximately September 2016 until September 2017, approximately once every two or three weeks, Lopez would watch the Barnetts' three grandchildren at the Queens residence while she was also caring for the Barnett's three youngest children.

48. From approximately October 2017 until the end of her employment in March 2020, the Barnetts sent Lopez to their daughter's house three times per week on Mondays, Thursdays, and Fridays. On Mondays and Thursdays, Lopez would be sent to the Barnetts' daughter's home at varying times and would clean, prepare dinner, and care for the Barnetts' daughter's three children. On Fridays, Lopez would spend the entire day preparing for that evening's Shabbat dinner.

49. From approximately October 2017 until the end of her employment in March 2020, Shabbat dinners took place at the Barnetts' daughter's home on most Fridays, with the Barnetts' home being used for Shabbat about once every two months.

**Lopez's Work Schedule**

50. When Lopez was a live-in domestic worker at both the Queens residence and the Rented Monsey residence from approximately September 2010 to December 2017, her regular weekly work schedule was: Monday to Thursday from approximately 7:00 a.m. until 8:00 p.m.; Friday from approximately 7:00 a.m. until 9:00 p.m. in the winter, and until approximately 11:00 p.m. in the summer; and Sunday from approximately 10:00 a.m. until 8:00 p.m. Lopez had Saturdays off. During this period, Lopez worked an approximate total of 76 to 78 hours per week.

51. When Lopez commuted to the Rented Monsey residence from approximately January 2018 until March 2020, her regular weekly work schedule was:

Monday to Thursday from approximately 8:30 a.m. until 8:00 p.m.; Friday from approximately 8:00 a.m. until 9:00 p.m. in the winter, and until approximately 11:00 p.m. in the summer; and Sunday from approximately 10:00 a.m. until 8:00 p.m.  Lopez had Saturdays off.  During this period, Lopez worked approximately 70 hours per week.

52. When Lopez worked as live-in domestic worker at the Pennsylvania residence, her regular weekly work schedule was:  Sunday to Thursday from approximately 8:00 a.m. until 8:00 p.m.; Friday from approximately 8:00 a.m. until 11:30 p.m.; and Saturday from approximately 11:00 a.m. until 10:00 p.m.  During these periods, Lopez worked approximately 86.5 hours per week.

53. While working at the Pennsylvania residence each summer, Lopez did not have a day off.

54. Throughout her employment, Defendants did not monitor or record the weekly hours worked by Lopez.

**Lopez's Compensation**

55. Throughout her employment with Defendants, Lopez was paid on a weekly salary basis.

56. From approximately 2013 until approximately October 2014, Lopez was paid $800 per workweek.

57. From approximately October 2014 until approximately June 2015, Lopez was paid $850 per workweek.

58. From approximately June 2015 until approximately October of 2015, Lopez was paid $900 per workweek.

59. From approximately October 2015 until approximately October 2016, Lopez was paid $950 per workweek.

9

60. From approximately October 2016 until approximately October 2017, Lopez was paid $1,000 per workweek.

61. From approximately October 2017 until approximately January 2019, Lopez was paid $1,050 per workweek.

62. From approximately January 2019 until the end of her employment with Defendants, Lopez was paid $1,200 per workweek.

63. In or about January 2019, when working at the Rented Monsey residence, Lopez would receive an additional $200 in weekly pay, totaling $1,400, to account for her time and costs spent commuting from her home to the Rented Monsey residence.

64. When Lopez worked seven days per week at the Pennsylvania residence, the Barnetts would pay her an additional lump sum equal to an extra day of work. For example, in the summer of 2019, the Barnetts paid Lopez $200 more, totaling $1,400 per week, to compensate her for the extra day of work.

**Lopez's Resignation**

65. When the COVID-19 pandemic arrived in New York in March 2020, the Barnetts insisted that Lopez take a test for the virus (which came back negative) and requested that she shelter in place at their residences and refrain from visiting her son at their home in Spring Valley, New York.

66. Given the circumstances, Lopez resigned from her employment with the Barnetts on March 18, 2020.

**FIRST CLAIM**
**(FLSA – Unpaid Overtime Wages)**

67. Plaintiff repeats and incorporates all foregoing paragraphs as if fully set forth herein.

10

68. Defendants were required to pay Plaintiff one and one-half (1½) times her regular hourly wage rates for all hours worked in excess of forty per workweek pursuant to the overtime wage provisions set forth in the FLSA, 29 U.S.C. § 207 *et seq.*

69. Defendants have failed to pay Plaintiff overtime wages to which she is entitled under the FLSA.

70. Defendants have willfully violated the FLSA by knowingly and intentionally failing to pay Plaintiff overtime wages.

71. Due to Defendants' violations of the FLSA, Plaintiff is entitled to recover unpaid overtime wages, liquidated damages, pre- and post-judgment interest, and reasonable attorneys' fees and costs of the action.

### SECOND CLAIM
### (NYLL – Unpaid Overtime Wages)

72. Plaintiff repeats and incorporates all foregoing paragraphs as if fully set forth herein.

73. Under the NYLL, the Domestic Workers' Bill of Rights, and supporting New York Department of Labor ("NYDOL") regulations, Defendants were required to pay Plaintiff one and one-half (1½) times her regular hourly wage rate for all hours worked in excess of 44 per workweek when working as a live-in domestic worker and in excess of 40 per workweek otherwise.

74. Pursuant to NYLL § 161(1), when working as a live-in domestic worker, Plaintiff was entitled to one day of rest every seven days, or overtime pay in lieu of the day off, on weeks when she worked seven days.

75. When working at the Pennsylvania residence, Defendants failed to provide Plaintiff one day of rest every seven days, or overtime pay in lieu of the day off.

11

76. Defendants have failed to pay Plaintiff the overtime wages to which she was entitled under the NYLL.

77. Defendants have willfully violated the NYLL by knowingly and intentionally failing to pay Plaintiff overtime wages.

78. Due to Defendants' willful violations of the NYLL, Plaintiff is entitled to recover unpaid overtime wages, liquidated damages, pre- and post-judgment interest, and attorneys' fees and costs.

### THIRD CLAIM
### (NYLL – Failure to Provide Wage Statements)

79. Plaintiff repeats and incorporates all foregoing paragraphs as if fully set forth herein.

80. Defendants failed to furnish Plaintiff with a statement at the end of each pay period reflecting: rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages; in violation of NYLL § 195(3).

81. Due to Defendants' violation of the NYLL, § 195(3), Plaintiff is entitled to recover from Defendants liquidated damages of $250.00 per workday, up to a maximum of $5,000.00, reasonable attorneys' fees, and costs and disbursements of the action, pursuant to the NYLL § 198(1–d).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

a. declaring that Defendants have violated the overtime wage provisions of the FLSA, NYLL, and NYDOL regulations;

   b. declaring that Defendants have violated the wage statement provisions of the NYLL and WTPA;

   c. declaring that Defendants' violations of the FLSA and NYLL were willful;

   d. awarding Plaintiff damages for unpaid overtime wages;

   e. awarding Plaintiff liquidated damages pursuant to the FLSA and the NYLL;

   f. awarding Plaintiff statutory damages as a result of Defendants' failure to furnish wage statements pursuant to the NYLL and WTPA;

   g. awarding Plaintiff pre- and post-judgment interest under the NYLL;

   h. awarding Plaintiff reasonable attorneys' fees and costs incurred in prosecuting this action pursuant to the FLSA and the NYLL; and

   i. awarding such other and further relief as the Court deems just and proper.

Dated: New York, New York
    September 3, 2020

              PECHMAN LAW GROUP PLLC

              By: *s/ Louis Pechman*
                 Louis Pechman
                 Catalina Cadavid
                 488 Madison Avenue, 17th Floor
                 New York, New York 10022
                 Tel.: (212) 583-9500
                 pechman@pechmanlaw.com
                 cadavid@pechmanlaw.com
                 *Attorneys for Plaintiff*